MATHEWS v. REX HEALTH AND ACCIDENT INSURANCE COMPANY.

[No. 12,769. Filed July 1, 1927.]

1. WITNESSES.—*Competency of physician performing autopsy.*— As a general rule, where the statute renders an attending physician incompetent to testify, any information acquired by him while performing an autopsy on the body is privileged, but if the information was acquired by an autopsy on the body of a person who was not a patient of the physician performing the autopsy, any information acquired by the physician was not privileged. p. 337.

2. WITNESSES.—*Physician employed in hospital incompetent to testify as to information acquired in performing autopsy on body of patient.*—A physician employed by a hospital in its laboratories and pathological department is incompetent to testify to information acquired while performing an autopsy on the body of a patient, though he had had nothing to do with the treatment of the patient while in the hospital, and was not on the medical staff of the hospital, but must be treated as an assistant of the physician in charge of the patient prior to his death, thus bringing the physician within the scope of §550 Burns 1926. p. 347.

From Marion Superior Court (A 25,222) ; *Sidney S. Miller,* Judge.

Action by Mattie Mathews against the Rex Health and Accident Insurance Company. From a judgment for defendant, the plaintiff appeals. *Reversed.* By the court in banc.

*R. L. Bailey,* for appellant.
*Earl J. Askren,* for appellee.

McMAHAN, J.—Action by appellant to recover on an insurance policy issued by appellee on the life of her son, she being named as beneficiary. The insured, at the time of his death and for some time prior thereto, was a patient at the City Hospital in Indianapolis. After his death, his body was taken to the autopsy room at the hospital, where Dr. Henry R. Alburger made an autopsy to determine the cause of the boy's death. Dr. Alburger, over the objection of appellant, was permitted to testify concerning the examination made by him and to the condition of the internal organs. He testified to a state of facts sufficient to avoid the policy and prevent a recovery. The case comes to us on a reserved question of law, relating to the competency of this witness.

Dr. Alburger had never seen the insured before his death and had nothing to do with treating him while the insured was at the hospital. He was not one of the doctors on the medical staff of the hospital. He was a physician, and in the employ of the hospital when he performed the autopsy, and received compensation from the hospital for the work he did. He was director of the laboratories and pathologist of the hospital at the time. Under §550 Burns 1926, physicians are not competent witnesses "as to matters communicated to them, as such, by patients, in the course of their professional business, or advice given in such cases."

Appellant contends that this statute rendered Dr. Al-

burger an incompetent witness, and that the admission of his testimony is reversible error.

So far as we are able to discover, the question presented by this appeal has never been passed upon by an appellate tribunal. Generally speaking, the

1. correct rule would seem to be that where the statute renders an attending physician incompetent to testify, any information acquired by him by reason of an autopsy held on the body of a former patient is privileged, but if the information was acquired by an autopsy upon the body of a person who was not, prior to his death, a patient of the physician performing the autopsy, the information acquired by the physician is not privileged.

In *Thomas* v. *Township of Byron* (1911), 168 Mich. 593, 134 N. W. 1021, 38 L. R. A. (N. S.) 1186, Ann. Cas. 1913C 686, where the physician who had been attending a woman before her death performed an autopsy upon her body in the absence of her husband and after he had refused to give his consent to have it performed, it was held reversible error to allow the physician to testify as to what the autopsy disclosed, and to give his conclusion as to the cause of her death. After calling attention to the statute of that state and the exclusion of the diagnosis made by the physician before death, the court said: "There is no dispute but that the relation of physician and patient existed during the lifetime of plaintiff's decedent, or that all communications and knowledge which are within the inhibition of our statute received by this physician during her lifetime, were privileged and so continue, there having been no waiver; but it is claimed that the death of the plaintiff's wife made this testimony competent. From the examination of this witness we conclude, by the questions asked, the answers to which were excluded as

privileged, that he had, during the lifetime of the patient, made such an examination of her person, and received such information, as was necessary to diagnose her case and prescribe for her, and also that he had disclosed to defendant's attorney such facts. We must conclude from the record that, on account of this relation, which existed between the witness and deceased, it was possible for him to proceed within a few hours after her death to hold an autopsy."

In *Harrison* v. *Sutter St. R. Co.* (1897), 116 Cal. 156, 47 Pac. 1019, 1 Am. Neg. Rep. 403, a person was fatally injured by reason of a collision between a street car and a brewery wagon. A physician made a medical examination of the injured party after the accident, at the instance of the brewing company, and an autopsical examination of the body after death. The relation of physician and patient, as appears from the opinion, never existed during the life of the deceased. In an action against the street car company and the brewery, the defendants called this physician as a witness and, over the objection of the plaintiff, the court permitted him to give the result of the medical examination, but excluded his testimony as to what was disclosed by the autopsy, upon the theory that the latter was not admissible under a statute forbidding a physician to testify without the consent of his patient as to any information acquired in attending the patient and which was necessary to enable him to prescribe for the patient. The court held this evidence should have been admitted, saying: "The evidence does not fall within the inhibition of that provision. A dead man is not a 'patient,' capable of sustaining the relation of confidence toward his physician which is the foundation of the rule given in the statute, but is a mere piece of senseless clay which has passed beyond the reach of human prescription, medical or otherwise. Moreover, the deceased had

not in life been the patient of Dr. O'Brien." The language of the court is such as to indicate that the testimony would not have been admissible if the deceased in his lifetime had been a patient of the physician who performed the autopsy. To this extent, the language used went beyond the case as presented to the court.

In *Chadwick* v. *Beneficial Life Ins. Co.* (1919), 54 Utah 443, 181 Pac. 448, the insured, in his application for insurance, stated that he had not consulted any physician and that so far as he knew he was in good health. The defense was that this answer was false and fraudulent. The defendant proved an admission made by the beneficiary after the death of the insured, tending to show that the insured had been a big, strong and vigorous man until a few months before applying for the insurance, when he began to complain of pains in the back which interfered with the performance of manual labor; that, during the time referred to, he had consulted a physician who diagnosed the case and treated him for rheumatism. This physician was then called and testified that the insured had consulted him before making the application for insurance, nothing being asked other than whether such a consultation was had. This physician was also the physician for the insurance company, and, over objection, was permitted to testify that he had performed an autopsy on the body of the deceased a day or two after death and found the cause of death was tuberculosis of the spine. He also testified as an expert that the disease and conditions were such that the deceased would know he was not in good health. The court, after calling attention to the statutory inhibition concerning physicians testifying, said: "The privilege claimed does not exist at common law. It was conferred by statute. In order to be available the claim of privilege must be brought within the clear meaning and spirit of the statute. Just how in-

formation acquired by means of an autopsy can be said to have been acquired to enable the physician to prescribe or act for the patient presents to our minds an insoluble question. When the patient is dead he is no longer a patient. The only functionaries that can thereafter be said to act for him are the undertaker and the gravedigger, and as to them the statute is silent. If it had been necessary for the witness to supplement the information he acquired during his attendance upon the patient, in order to determine the cause of his death, a different question would be presented. But this hypothesis was excluded by other questions propounded to the witness. This exception should not prevail. *Harrison* v. *Sutter St. R. Co.,* 116 Cal. 156, 47 Pac. 1019; 40 Cyc 2388; *Carmody* v. *Capitol Traction Co.,* 43 App. D. C. 245, Ann. Cas. 1916D 706."

*Carmody* v. *Capitol Traction Co.* (1915), 43 App. (D. C.) 245, Ann. Cas. 1916D 706, was an action for negligently causing the death of plaintiff's intestate, John Carmody. After the death of the intestate, at the instance of plaintiff's counsel, an autopsy was held by two physicians, who, over plaintiff's objection, testified as witnesses for the defense as to the result of their examination into the cause of death. In holding the evidence admissible, the court said: "It is clear that the privilege is extended alone to the patient, and can only be waived by him or his legal representative. It depends wholly upon the confidential relation existing between the patient and his physician. No such relation existed between Carmody and the two surgeons who performed the autopsy. Neither of the surgeons, so far as he knew, had even seen Carmody during his lifetime. It is inconceivable that they would disclose anything at the trial in the nature of confidential information. The relation between a surgeon performing an autopsy and

the body of the dead person is not the relation of a physician and patient."

In *Ossenkop* v. *State* (1910), 86 Nebr. 539, 126 N. W. 72, the defendant was convicted of manslaughter. After the homicide, the defendant employed a physician to examine the body of the deceased person and to report the result. Later, the same physician was employed by the state to make a post-mortem examination, and on the trial he testified as to the conditions found. The court held the testimony was properly admitted. The defendant claimed that because he had employed the physician to make an examination of the body of his victim, the knowledge acquired by the physician was privileged. This contention was denied, and very properly. In holding the testimony admissible, the court said: "In the present case the physician was not employed to examine or treat defendant or any member of his family. The relation of physician and patient did not exist between them. The exhumed body contained no secrets which could be kept within the exclusive knowledge of defendant and the physician. The means of ascertaining the condition of the body was equally within the reach of defendant and the state. The court was entitled to know the truth. * * * The purpose of the statute is to protect patients from objectionable disclosures, but it was never intended to shield defendant in his present position."

In an action to contest a will, a physician who had attended the testator during his last illness, and who was an attesting witness to the will, was called as a witness by the proponent. On direct examination, he was asked his opinion as to the sanity of the testator, and answered that he was of sound mind when he signed the will. On cross-examination, he was permitted to testify as to the nature of testator's affliction, and as

to the disclosures shown by an autopsical examination. This was held proper. See *In re Mullin* (1895), 110 Cal. 252, 42 Pac. 645.

The above are the only cases we have been able to find, or to which our attention has been called, dealing with the admissibility of a physician's testimony as to an autopsical examination made by him.

This brings us to a consideration of the relationship between a hospital, its physicians and attendants, and patients therein. The witness in the instant case came in contact with the deceased by virtue of his employment and connection with the hospital, and it was in this employment only that he became possessed of the information to which he testified.

In *Chicago, etc., R. Co.* v. *Walas* (1922), 192 Ind. 369, 135 N. E. 150, 22 A. L. R. 1212, appellee was injured while attempting to board one of appellant's trains, and, while in an unconscious condition, was taken to a hospital by the railroad company. The physician testified that, according to his best recollection, he was in the emergency ward working on another case when the appellee was brought into the room; that a few minutes later the nurse notified him he was to take care of appellee; that in the interval, but before being so notified by the nurse, he saw appellee vomiting and formed an opinion as to whether appellee was intoxicated and that, a short time thereafter, he was notified to and did attend him as a patient. The court refused to permit appellant to prove by the physician that appellee was intoxicated at the time the physician first saw him, which as stated was before the witness had been notified that he was to take care of him. In holding the exclusion of the offered testimony not error, the court said: "Appellee was in the hospital, in charge of nurses and attendants who were under the supervision and control of the witness, and had been prepared by them for a

surgical operation to be performed by the witness, and had been brought into the presence of the witness in the operating room for the express purpose of submitting to an operation which the witness performed a few moments later. And the mere fact that the witness had not yet been told that he was to operate, instead of some other physician who used the same room, does not bring the case within that exception to the statute which permits a physician to testify about what he observed or learned when he was not engaged in the duties of his profession. Whatever facts the doctor learned as to the condition of appellee, when he was in the emergency room of the hospital awaiting surgical treatment by the doctor, clearly was learned 'in the course of his professional business' within the meaning of the statute."

*Stalker* v. *Breeze* (1917), 186 Ind. 221, 114 N. E. 968, was an action to contest a will. The testator had been a patient in a hospital. The appellant called one of the nurses who had made a portion of the hospital record as a witness and examined her in relation to certain things she found in the hospital record. Later appellee was permitted to read in evidence the record kept by the nurses. This was held not reversible error under the circumstances. In this connection, the court said: "We are of the opinion that, although the clinical record itself may be incompetent as a privileged communication (*Smart* v. *Kansas City* [1907], 208 Mo. 162, 105 S. W. 709, 14 L. R. A. [N. S.] 565, 578, 123 Am. St. 41) the error, if any, in permitting the clinical record to be read in evidence was rendered harmless by appellant's asking his own witness, one of the nurses, to testify as to part of the contents of the same record."

In *New York, etc., R. Co.* v. *Shields* (1916), 185 Ind. 704, 112 N. E. 762, an injured person was taken to a hospital and a doctor called (by whom, not disclosed) to

treat him.   The defendant attempted to prove by the doctor that the plaintiff was intoxicated when he first saw him.   The evidence was held correctly excluded. From the doctor's statement, he saw the injured party as his physician, and it was in that capacity only that he became possessed of the facts solicited by the question.

In *Smart* v. *Kansas City* (1907), 208 Mo. 162, 105 S. W. 709, cited in *Stalker* v. *Breeze, supra,* it was held that assistant physicians or surgeons in a hospital to which a person had been taken for treatment were incompetent to testify, over objection, to anything connected with the treatment or as to the condition of such person while there; that it made no difference whether the person was a poor or pay patient, in a private residence, or in a hospital, or whether the person was a charity patient in a public hospital; that a patient in a hospital has the right to assume and rely upon the assumption that a physician apparently in charge of the hospital is rightfully there, and has authority to examine and prescribe for him, and that the physician will not afterwards be heard to say he was not connected with the institution and had no authority to treat the patient, for the purpose of allowing him to testify as to the condition of the patient while in the hospital.   It was also held that the official record of a hospital into which had been copied the attending physician's diagnosis of a patient was privileged and not admissible in evidence over the patient's objection.   Referring to the assistant physicians and surgeons at the hospital, the court said:   "Under and by virtue of their appointment, contract, or by whatever arrangement they became assistant physicians in that hospital, they were constituted the physician and surgeon of each and every patient who entered that institution for treatment, and they had no legal or moral right or authority to view,

treat or operate upon any of them, except by virtue of that appointment or contract. Even their very presence there is traceable to and authorized by that authority and none other; and the intrusion of a physician or surgeon into an institution of the character in question, and his assumption of authority to observe and examine patients without the permission of those in charge, and by the consent of the patients, would constitute him a trespasser. Such is not tolerated by the law, and would not and should not be permitted by those in charge. The relation of physician and patient is one of contract, either express or implied, and can be created in no other way. In cases of this character the physician or surgeon in accepting such a position impliedly, at least, agrees to treat such patients as are accepted into the institution, and when he assumes to examine them, either by their express agreement or by their implied or tacit consent, which may be inferred from the act of entrance into the institution, and which will be inferred in the absence of evidence indicating a contrary intention in either event, whenever the minds of the physician and patient meet by either express or implied contract, the statute places the seal of secrecy upon all information acquired by the physician in such professional capacity."

And in discussing the admissibility of the hospital records as evidence, the court said: "The mere fact that the ordinance of the city requires such a record to be kept is no reason on earth why the statute regarding privileged communications should be violated. That record is required to be kept for the benefit of the institution and not for the benefit of outside litigants. It is not the object or purpose of the ordinance to repeal the statute in question, but even if it were, it would be null and void, because in conflict with the statute. The object of the statute is to guarantee privileged com-

munications between *all patients* and their physicians, and it is wholly immaterial whether they are in or out of hospitals."

In *Price* v. *Standard Life & Accident Ins. Co.* (1903), 90 Minn. 264, 95 N. W. 1118, it was held that the register of patients kept at a hospital naming or pretending to name the disease with which a patient was said to be suffering was not admissible, the court saying: "To permit these entries to be introduced in evidence was to disregard in a very noticeable manner the rule forbidding the introduction of hearsay testimony, as well as the spirit of the statute which prohibits the examination of a physician as to certain matters without the consent of his patient, although this last objection does not appear to have been made at the trial."

In *Beave* v. *St. Louis Transit Co.* (1908), 212 Mo. 331, 111 S. W. 52, it was held that a physician in charge of a hospital and who examined a patient therein every few days, because, as he said, he was responsible for every person who entered the hospital for treatment, and whose associates and assistant physicians and surgeons, under his supervision, treated and operated upon the patient, was incompetent to testify over an objection. The mere fact that the witness did not prescribe for the patient did not change the rule, if, through his assistants, he had charge of the patient.

The record of a hospital where an insured person was treated prior to his application for insurance is not admissible, nor can the operating or the assistant surgeon testify. *Sparer* v. *Travellers Ins. Co.* (1919), 185 App. Div. 861, 173 N. Y. Supp. 673.

Dr. Alburger, in describing his connection with the hospital, says he was an executive of the hospital, director of the laboratories, and the pathologist at the head of the department. While he was a practicing physician, he did not treat appellant's son and did not

see him prior to his death. When he first saw the body of the boy, it was on the table in the autopsy room of the hospital. In testifying concerning the circumstances under which the autopsy was held, he said: "The rule of the hospital is, if a patient should die in the City Hospital, he is brought to the morgue and placed in the autopsy room where later it (an autopsy) is held." It may be inferred from his testimony that, as a general rule, where a patient has relatives, their consent, written or verbal, is generally obtained before an autopsy is performed, but that there are circumstances when they are called on to know the cause of death that no consent is secured, and that this was one of the cases in which the hospital authorities decided to hold an autopsy for its own satisfaction without the request or consent of any one. The direction to hold an autopsy comes through the hospital office. Dr. Alburger simply received the body, was told to hold the autopsy, and went ahead and did it.

In the instant case, the boy, prior to and at the time of his death, was a patient in the hospital. After death, his body was placed on the table in the autopsical room by some one in authority, and Dr. Alburger performed the autopsy as a part of his duties as head of the pathological department of the hospital. The purpose of which was to discover the cause of death. The fact that the boy was a patient at the hospital provided the opportunity for having the autopsical examination. It was the outgrowth of the relationship existing between the patient and the hospital, and it would not have been performed except for the fact of that relationship. If it had been held by the physician who treated the boy before his death, such physician would have been an incompetent witness as to any information acquired by reason of such examination. Any physician or surgeon assisting him would also have been

incompetent to testify, over objection, to any knowledge acquired thereby.   Can a physician, after the death of his patient, through his consent or connivance, allow another physician to take the dead body of his patient, and, in the absence of friends and relatives, and without the consent of any one, hold a post mortem examination and thus give to the public the information which the physician in charge could not?   Can a hospital, immediately after the death of one of its patients, discharge the physician who had attended the patient up to the time of death, and thereafter rush the dead body to the morgue and direct the physician at the head of the pathological department to perform an autopsy, and thus evade the statute which sealed the lips of the first physician?   We think these questions should be answered in the negative, and that a physician under such circumstances steps into the shoes of the attending physician, and must be treated as if he were the assistant of the attending physician, holding the autopsy at the direction of the latter, and that the information acquired by him through the autopsy is privileged.   A physician should not be privileged to authorize or permit another physician to hold an autopsy on one of his patients and thus destroy the privileged character of the information thus acquired.   Neither should a hospital, after the death of one of its patients, authorize or permit a physician other than the attending physician to hold an autopsy and destroy the privileged character of the information thus acquired.   In order to protect those who are so unfortunate as to become patients in a public hospital, as in the instant case, from having their bodies violated after death in order to discover the cause of death and thus qualify a physician to appear in court as a witness and disclose the cause of death, we are constrained to hold the court erred in allowing Dr. Alburger to testify as to the information he

acquired through the autopsy. The doctor had no more right to make this examination, and to disclose the information thus received, than he would have had if he had gone into the sick room prior to the boy's death and made an examination to ascertain the cause of the boy's illness and to then go into court and testify as to the information thus acquired. He should be treated as an assistant of the physician in charge prior to the boy's death.

Judgment reversed, with directions to grant a new trial, and for further proceedings consistent with this opinion.

Dausman, J., absent.